UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1671
(4:11-cv-00045-RAJ-TEM

BOBBY BLAND; DANIEL RAY CARTER, JR.; DAVID W. DIXON; ROBERT
W. MCCOY; JOHN C. SANDHOFER; DEBRA H. WOODWARD,

Plaintiffs - Appellants,

v.

B. J. ROBERTS, individually and in his official capacity as
Sheriff of the City of Hampton, Virginia,

Defendant - Appellee.

--------------------------------

AMERICAN CIVIL LIBERTIES UNION; AMERICAN CIVIL LIBERTIES
UNION OF VIRGINIA FOUNDATION; FACEBOOK, INC.; NATIONAL
ASSOCIATION OF POLICE ORGANIZATIONS,

Amici Supporting Appellants.

O R D E R

The Court amends its opinion filed September 18, 2013,

as follows:

On page 8, first full paragraph, line 10 -- quotation

marks are inserted after the word "concern" and before the words

"as an employee" and the words "rather than" are substituted for the word "or".

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1671

BOBBY BLAND; DANIEL RAY CARTER, JR.; DAVID W. DIXON; ROBERT
W. MCCOY; JOHN C. SANDHOFER; DEBRA H. WOODWARD,

Plaintiffs - Appellants,

v.

B. J. ROBERTS, individually and in his official capacity as
Sheriff of the City of Hampton, Virginia,

Defendant - Appellee.

--------------------------------

AMERICAN CIVIL LIBERTIES UNION; AMERICAN CIVIL LIBERTIES
UNION OF VIRGINIA FOUNDATION; FACEBOOK, INC.; NATIONAL
ASSOCIATION OF POLICE ORGANIZATIONS,

Amici Supporting Appellants.

Appeal from the United States District Court for the Eastern
District of Virginia, at Newport News.   Raymond A. Jackson,
District Judge.  (4:11-cv-00045-RAJ-TEM)

Argued:  May 16, 2013          Decided:  September 18, 2013

Before TRAXLER, Chief Judge, THACKER, Circuit Judge, and Ellen
Lipton HOLLANDER, United States District Judge for the District
of Maryland, sitting by designation.

Affirmed in part, reversed in part, and remanded by published
opinion.  Chief Judge Traxler wrote the opinion, in which Judge

Thacker joined. Judge Hollander wrote a separate opinion concurring in part and dissenting in part.

―――――――

**ARGUED:** James Harrell Shoemaker, Jr., PATTEN, WORNOM, HATTEN & DIAMONSTEIN, LC, Newport News, Virginia, for Appellants. Aaron M. Panner, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C., Washington, D.C., for Amicus Facebook, Inc. Jeff W. Rosen, PENDER & COWARD, PC, Virginia Beach, Virginia, for Appellee. **ON BRIEF:** Lisa Ehrich, PENDER & COWARD, PC, Virginia Beach, Virginia, for Appellee. Andrew E. Goldsmith, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C., Washington, D.C., for Amicus Facebook, Inc. Aden J. Fine, Kathryn A. Wood, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Rebecca K. Glenberg, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA FOUNDATION, INC., Richmond, Virginia, for Amici American Civil Liberties Union and ACLU of Virginia. J. Michael McGuinness, THE MCGUINNESS LAW FIRM, Elizabethtown, North Carolina; William J. Johnson, NATIONAL ASSOCIATION OF POLICE ORGANIZATIONS, Alexandria, Virginia, for Amicus National Association of Police Organizations.

―――――――

TRAXLER, Chief Judge:

Six plaintiffs appeal a district court order granting summary judgment against them in their action against B.J. Roberts in his individual capacity and in his official capacity as the Sheriff of the City of Hampton, Virginia. The suit alleges that Roberts retaliated against the plaintiffs in violation of their First Amendment rights by choosing not to reappoint them because of their support of his electoral opponent. We affirm in part, reverse in part, and remand for trial.

I.

Viewing the facts in the light most favorable to the plaintiffs, as we must in reviewing an order granting summary judgment against them, the record reveals the following. Bobby Bland, Daniel Ray Carter, Jr., David W. Dixon, Robert W. McCoy, John C. Sandhofer, and Debra H. Woodward ("the Plaintiffs") are all former employees of the Hampton Sheriff's Office ("the Sheriff's Office").

Roberts was up for re-election in November 2009, having served as sheriff for the prior 17 years. Jim Adams announced in early 2009 that he would run against Sheriff Roberts. Adams had worked in the Sheriff's Office for 16 years and had become the third most senior officer, with a rank of lieutenant colonel, when he resigned in January 2009 to run.

3

The Hampton City Police Department has primary responsibility for law enforcement in Hampton. However, the Sheriff's Office maintains all city correctional facilities, secures the city's courts, and serves civil and criminal warrants. In December 2009, the Sheriff's Office had 190 appointees, including 128 full-time sworn deputy sheriffs, 31 full-time civilians, 3 unassigned active duty military, and 28 part-time employees. Carter, McCoy, Dixon, and Sandhofer were sworn, uniformed sheriff's deputies who worked as jailers in the Sheriff's Office Corrections Division.[1] They had not taken the Virginia Department of Criminal Justice Services' "Basic Law Enforcement" course, completion of which was required in Virginia for an officer to patrol and have immediate arrest powers.[2] However, they did take the "Basic Jailer and Court Services" course, which has about half as long a curriculum as the Basic Law Enforcement course. Although they did not have general powers of immediate arrest, the deputies did have the

---

[1] Sandhofer worked as a jailer for most of his short time in the Sheriff's Office, although he worked as a civil process server in the Sheriff's Office Civil Process Division for the final three months of his tenure.

[2] The Virginia Department of Criminal Justice Services, Division of Law Enforcement, has the responsibility of overseeing and managing training standards and regulations for the criminal justice community.

authority to make "incidental arrest[s] in [the] range of [their] work." J.A. 297.

Bland and Woodward were not deputies, but rather worked in non-sworn administrative positions. Woodward was a training coordinator and Bland was a finance and accounts payable officer.

Notwithstanding laws and regulations prohibiting the use of state equipment or resources for political activities, see Hatch Act, 5 U.S.C. § 1501, et. seq.; 22 Va. Admin. Code § 40-675-210 (2012), Sheriff Roberts used his office and the resources that he controlled, including his employees' manpower, to further his own re-election efforts. His senior staff often recruited Sheriff's Office employees to assist in these efforts. For example, he used his employees to work at his annual barbeque/golf tournament political fundraiser, and his subordinates pressured employees to sell and buy tickets to his fundraising events.

The Sheriff won reelection in November 2009. He subsequently reappointed 147 of his 159 full-time employees. Those not reappointed included the six Plaintiffs as well as five other deputies and one other civilian.

On March 4, 2011, the Plaintiffs filed suit in federal district court against Sheriff Roberts in his individual and official capacities under 42 U.S.C. § 1983. All six Plaintiffs

5

alleged that the Sheriff violated their First Amendment right to free association when he refused to reappoint them based on their lack of political allegiance to him in the 2009 election. Additionally, Carter, McCoy, Dixon, and Woodward alleged that the Sheriff violated their First Amendment right to free speech when he refused to reappoint them because of various instances of speech they made in support of Adams's campaign. Among the remedies Plaintiffs requested were compensation for lost back pay and compensation for lost front pay or, alternatively, reinstatement. The Sheriff answered Plaintiffs' complaint and asserted several affirmative defenses.

Roberts subsequently moved for summary judgment, and the district court granted it. See Bland v. Roberts, 857 F. Supp. 2d 599 (E.D. Va. 2012). Regarding the free-speech claims, the district court concluded that Carter, McCoy, and Woodward had all failed to allege that they engaged in expressive speech and that Dixon had not shown that his alleged speech was on a matter of public concern. See id. at 603-06. Regarding the association claims, the court concluded that Plaintiffs failed to establish any causal relationship between their support of Adams's campaign and their non-reappointment. See id. at 606-07. Finally, assuming arguendo that the Sheriff did violate Plaintiffs' First Amendment rights, the district court concluded he was entitled to qualified immunity on the individual-capacity

6

claims and Eleventh Amendment immunity on the official-capacity claims. See id. at 608-10.

## II.

On appeal, the Plaintiffs maintain that the district court erred in granting summary judgment against them.

This court reviews de novo a district court's order granting summary judgment, applying the same standards as the district court. See Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Plaintiffs allege that they were retaliated against for exercising their First Amendment rights to free speech and association. The First Amendment, in relevant part, provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The Fourteenth Amendment makes this prohibition applicable to the states. See Fisher v. King, 232 F.3d 391, 396 (4th Cir. 2000). Not only does the First Amendment protect freedom of speech, it also protects "the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). Although government employees do

7

not forfeit their constitutional rights at work, it is well established "that the government may impose certain restraints on its employees' speech and take action against them that would be unconstitutional if applied to the general public." Adams v. Trustees of the Univ. of N.C.-Wilmington, 640 F.3d 550, 560 (4th Cir. 2011) (internal quotation marks omitted).

The Supreme Court in Connick v. Myers, 461 U.S. 138 (1983), and Pickering v. Board of Education, 391 U.S. 563 (1968), has explained how the rights of public employees to speak as private citizens must be balanced against the interest of the government in ensuring its efficient operation. In light of these competing interests, we have held that in order for a public employee to prove that an adverse employment action violated his First Amendment rights to freedom of speech, he must establish (1) that he "was speaking as a citizen upon a matter of public concern" rather than "as an employee about a matter of personal interest"; (2) that "the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public"; and (3) that "the employee's speech was a substantial factor in the employee's termination decision." McVey v. Stacy,

157 F.3d 271, 277-78 (4th Cir. 1998).[3]  In conducting the balancing test in the second prong, we must consider the context in which the speech was made, including the employee's role and the extent to which the speech impairs the efficiency of the workplace.  See Rankin v. McPherson, 483 U.S. 378, 388-91 (1987).

> Factors relevant to this inquiry include whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the [agency]; (6) undermined the mission of the [agency]; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the [agency]; and (9) abused the authority and public accountability that the employee's role entailed.

Ridpath v. Board of Governors Marshall Univ., 447 F.3d 292, 317 (4th Cir. 2006).  Accordingly, "a public employee who has a confidential, policymaking, or public contact role and speaks out in a manner that interferes with or undermines the operation of the agency, its mission, or its public confidence, enjoys substantially less First Amendment protection than does a lower level employee."  McVey, 157 F.3d at 278.

---

[3] The Sheriff appropriately does not contend that the fact that the Plaintiffs were simply not reappointed – as opposed to being otherwise discharged – affects the constitutionality of his actions.  The critical fact for our purposes is that the termination of the Plaintiffs' employment with the Sheriff's Office was not the Plaintiffs' decision.  See Branti v. Finkel, 445 U.S. 507, 512 n.6 (1980).

"This principle tends to merge with the established jurisprudence governing the discharge of public employees because of their political beliefs and affiliation." Id. Such claims must be analyzed under the principles established by Elrod v. Burns, 427 U.S. 347 (1976), and Branti v. Finkel, 445 U.S. 507 (1980). See Fields v. Prater, 566 F.3d 381, 385-86 (4th Cir. 2009). These cases make clear that the First Amendment generally bars the firing of public employees "solely for the reason that they were not affiliated with a particular political party or candidate," Knight v. Vernon, 214 F.3d 544, 548 (4th Cir. 2000) (internal quotation marks omitted), as such firings can impose restraints "on freedoms of belief and association," Elrod, 427 U.S. at 355 (plurality opinion); see Smith v. Frye, 488 F.3d 263, 268 (4th Cir. 2007).[4] Still, the Supreme Court in Elrod created a narrow exception "to give effect to the democratic process" by allowing patronage dismissals of those public employees occupying policymaking positions. Jenkins v. Medford, 119 F.3d 1156, 1161 (4th Cir. 1997) (en banc). This exception served "the important government goal of assuring 'the implementation of policies of

---

[4] "The 'right of free association [is] a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society.'" Cromer v. Brown, 88 F.3d 1315, 1331 (4th Cir. 1996) (quoting Shelton v. Tucker, 364 U.S. 479, 486 (1960)).

10

[a] new administration, policies presumably sanctioned by the electorate.'" Id. (quoting Elrod, 427 U.S. at 367). In Branti, the Supreme Court modified the Elrod test somewhat to "recognize[] that the labels used in Elrod ignored the practical realities of job duty and structure." Id. Under the test as modified, "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation [or political allegiance] is an appropriate requirement for the effective performance of the public office involved." Branti, 445 U.S. at 518.

In Stott v. Haworth, 916 F.2d 134 (4th Cir. 1990), we adopted a two-part test for conducting this analysis. See Fields, 566 F.3d at 386. First, we consider whether "the [plaintiff's] position involve[s] government decisionmaking on issues where there is room for political disagreement on goals or their implementation." Stott, 916 F.2d at 141 (internal quotation marks omitted). If it does, we then "examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation [or political allegiance] is an equally appropriate requirement." Id. at 142 (internal quotation marks omitted). The first step of the inquiry

11

requires us to examine the issues dealt with by the employee "at a very high level of generality," while "[t]he second step requires a much more concrete analysis of the specific position at issue." Fields, 566 F.3d at 386. At the second step, "courts focus on the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." Stott, 916 F.2d at 142. In this regard, we focus on the job description for the position in question and "only look past the job description where the plaintiff demonstrates some systematic unreliability, such as where the description has been manipulated in some manner by officials looking to expand their political power." Nader v. Blair, 549 F.3d 953, 961 (4th Cir. 2008) (internal quotation marks omitted).[5]

Our causation analysis for the association claims is the same as for the speech claims. The plaintiff bears the initial burden of proving that his exercise of his First Amendment rights "was a 'substantial' or 'motivating' factor in the employer's decision to terminate him." Wagner v. Wheeler, 13

---

[5] We note that in cases in which the Elrod-Branti exception applies, and an employer thus can terminate his employees for political disloyalty, he may also terminate them for speech that constitutes such disloyalty. See Jenkins v. Medford, 119 F.3d 1156, 1164 (4th Cir. 1997) (en banc) (holding that because pleadings established that Elrod-Branti exception applied, deputies failed to state a First Amendment speech retaliation claim that deputies were dismissed for campaigning against the sheriff).

12

F.3d 86, 90 (4th Cir. 1993); Sales v. Grant, 158 F.3d 768, 775-76 (4th Cir. 1998). And if the plaintiff satisfies that burden, the defendant will avoid liability if he can demonstrate, by a preponderance of the evidence, that he would have made the same employment decision absent the protected expression. See Sales, 158 F.3d at 776 (citing O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 725 (1996)).

Plaintiffs challenge the district court's rulings with regard to the merits of both their association and their speech claims as well as with regard to qualified and Eleventh Amendment Immunity. We begin our analysis with the merits of Plaintiffs' association claims and will then address the merits of the speech claims before turning to Eleventh Amendment and qualified immunity.

A.   Merits of Association Claims

We conclude that Carter, McCoy, and Dixon at least created genuine factual disputes regarding whether the Sheriff violated their association rights, but that Sandhofer, Woodward, and Bland did not.

1.   Elrod-Branti

With regard to these claims, we start by asking whether the Sheriff had the right to choose not to reappoint the Plaintiffs for political reasons. Certainly there is legitimate disagreement over the goals and implementation of the goals of a

13

sheriff's office; accordingly, the outcome of the Stott test will turn on the outcome in Stott's second step. See, e.g., Knight, 214 F.3d at 548-51. Thus, it is that part of the test on which we focus our attention.

Carter, McCoy, and Dixon all occupied the same position in the Sheriff's Office.[6] They were uniformed jailers and they held the title of sheriff's deputy. Because they held that title, much of the debate between the parties concerning the application of the Elrod-Branti test to these three men relates to our decision in Jenkins. In Jenkins we analyzed the First Amendment claims of several North Carolina sheriff's deputies who alleged that the sheriff fired them for failing to support his election bid and for supporting other candidates. In so doing, we considered the political role of a sheriff, the specific duties performed by sheriff's deputies, and the relationship between a sheriff and his deputies as it affects the execution of the sheriff's policies. See Jenkins, 119 F.3d at 1162-64. We generally concluded that deputies "play a special role in implementing the sheriff's policies and goals," that "[t]he sheriff is likely to include at least some deputies

---

[6] We do not address whether Sandhofer, Woodward, or Bland could be terminated for lack of political allegiance because, as we will discuss, they have not created genuine factual disputes regarding whether lack of political allegiance was a substantial basis for their non-reappointment.

14

in his core group of advisors," that deputies "exercis[e] significant discretion in performing their jobs" when they are on patrol, that "[t]he sheriff relies on his deputies to foster public confidence in law enforcement," that he expects them to provide him with the "truthful and accurate information" the sheriff needs, and that sometimes deputies serve as the sheriff's general agents whose acts can expose the sheriff to civil liability.  See id. at 1162-63.  We therefore concluded "that in North Carolina, the office of deputy sheriff is that of a policymaker, and that deputy sheriffs are the alter ego of the sheriff generally, for whose conduct he is liable."  Id. at 1164.  On that basis, we determined "that such North Carolina deputy sheriffs may be lawfully terminated for political reasons under the Elrod-Branti exception to prohibited political terminations."  Id.; see also id. ("We hold that newly elected or reelected sheriffs may dismiss deputies either because of party affiliation or campaign activity.").  We reasoned that "[b]ecause they campaigned for [the sheriff's] opponents, the deputies in the instant case had no constitutional right to continued employment after the election, and so have failed to state a claim under 42 U.S.C. § 1983."  Id.

Had Jenkins's analysis ended there, our Elrod-Branti review of Carter's, McCoy's, and Dixon's claims would be quite straight-forward.  But Jenkins's analysis did not end there.

15

Several judges dissented from the majority's decision, and the resulting opinions included an exchange of particular relevance here. The dissent maintained that "the majority broadly holds that all deputy sheriffs in North Carolina – regardless of their actual duties – are policymaking officials." Id. at 1166 (Motz, J., dissenting). The dissent contended that had a proper Elrod-Branti review been conducted, focusing on "analysis of the particular duties of each deputy," the result of the case would have been different. Id.

For its part, the majority flatly rejected the dissent's claim that the decision was not based on the duties of the deputies before the court. The majority stated:

> We limit dismissals based on today's holding to those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff. We issue this limitation to caution sheriffs that courts examine the job duties of the position, and not merely the title, of those dismissed.[FN66] Because the deputies in the instant case were law enforcement officers, they are not protected by this limitation.[FN67]
>
> > FN66. See Stott, 916 F.2d at 142; Zorzi v. County of Putnam, 30 F.3d 885, 892 (7th Cir. 1994) (dispatchers not involved in law enforcement activities or policy, so political affiliation inappropriate job requirement).
> >
> > The dissent manifests a misunderstanding of our holding. It applies only to those who meet the requirements of the rule as we state it, and does not extend to all 13,600

16

> officers in North Carolina, as the dissent suggests.
>
> FN67. Amended Complaint, ¶ 19.

_Id._ at 1165 (majority opinion). Responding to the conclusion that the deputies' law enforcement duties made their political loyalty to the sheriff an appropriate requirement for the effective performance of the deputies' jobs, the dissent emphasized that the only relevant allegations in the plaintiffs' complaint were that the deputies' "job requirements consisted of performing <u>ministerial</u> law enforcement duties for which political affiliation is not an appropriate requirement" and that none of the plaintiffs "occupied a policymaking or confidential position." _Id._ at 1166 (Motz, J., dissenting) (internal quotation marks omitted).

That brings us to the question of how to read <u>Jenkins</u>. Despite a significant amount of language in the opinion seemingly indicating that all North Carolina deputies could be terminated for political reasons regardless of the specific duties of the particular deputy in question, and despite the dissent's allegation that the majority indeed held that all North Carolina deputies may be fired for political reasons, the majority explicitly stated that it analyzed the duties of the plaintiffs and not merely those of deputies generally. _See_ <u>id.</u> at 1165 (majority opinion). In the end, the majority explained

17

that it was the deputies' role as sworn law enforcement officers that was dispositive and suggests that the result might have been different had the deputies' duties consisted of working as dispatchers. See id. at 1165 & nn. 66-67. Accordingly, to be true to Jenkins, we too must consider whether requiring political loyalty was an appropriate requirement for the effective performance of the public employment of the deputies before us in light of the duties of their particular positions.

According to their formal job description, the deputies' duties and responsibilities were to "[p]rovide protection of jail personnel and the public," "[p]rovide safekeeping and welfare of prisoners," "[p]rotect[] . . . society by preventi[ng] . . . escapes," "[c]onduct security rounds," "[s]upervise inmate activities," "[p]rovide cleaning supplies to inmates to clean their cells," "[p]ass out razors on appropriate days," "[e]scort inmates throughout the jail as required," "[m]aintain floor log of daily inmate activities," "[e]nsure inmates are [fed]," "[r]un recreation and visitation as scheduled or authorized," "[a]nswer inmate correspondences and grievances," and "[s]upervise laundry detail." J.A. 602. None of the men had leadership responsibilities, nor were they confidants of the Sheriff.

These duties are essentially identical to those of the plaintiff in Knight v. Vernon. In that case, we considered

18

whether the district court erred in granting summary judgment against a sheriff's office employee on her First Amendment political firing claim on the basis that the employee could be lawfully terminated for political reasons. See Knight, 214 F.3d at 548. Unlike Carter, McCoy, and Dixon, Knight did not have the title of sheriff's deputy, but Knight worked for a North Carolina sheriff's department as a low-level jailer. See id. at 549, 550. Noting that "[t]he central message of Jenkins is that the specific duties of the public employee's position govern whether political allegiance to her employer is an appropriate job requirement," see id. at 549, we closely examined the duties of Knight's job in applying the Elrod-Branti analysis at the summary judgment stage:

> As a jailer Ms. Knight was responsible for the processing, supervision and care, and transportation of inmates. Ms. Knight's processing duties included fingerprinting new inmates, obtaining their personal data (addresses, next of kin, etc.), marking and storing their personal belongings, routing them for physical examinations, and arranging for their initial baths and changes into clean clothing. Ms. Knight's daily supervision and care duties involved monitoring inmates every half hour, distributing and logging their medications and supplies, serving them food, and managing their visitors. Occasionally, Ms. Knight filled in as a cook when help was short in the jail's kitchen. Finally, Ms. Knight assisted in transporting inmates to prisons and medical facilities.

Id. at 546. In holding that Jenkins did not allow the sheriff to terminate Knight for political reasons, we contrasted Knight's duties with those of the deputy sheriffs in Jenkins.

19

We noted that "a deputy is a sworn law enforcement officer [and thus] has the general power of arrest, a power that may be exercised in North Carolina only by an officer who receives extensive training in the enforcement of criminal law." Id. at 550. We also noted that "[a] sworn deputy is the sheriff's alter ego: he has powers conterminous with his principal, the elected sheriff." Id. (internal quotation marks omitted). In contrast, we explained that the jailer's authority "is much more circumscribed" and "[h]er training, which is much more limited than that of a deputy, is concentrated on matters of custodial care and supervision." Id. We noted that "exercising the power of arrest is not one of the job duties of a jailer," and Knight "was not out in the county engaging in law enforcement activities on behalf of the sheriff," and she was not "a confidant of the sheriff." Id. We further noted that she neither "advise[d] him on policy matters" nor was "involved in communicating the sheriff's policies or positions to the public." Id. Although we recognized that the job of jailer involves the exercise of some discretion, we concluded that "a jailer does not exercise the 'significant discretion'" that the North Carolina deputies generally exercise. Id. at 551. Rather, because she "worked mostly at the jail performing ministerial duties," she was "not entrusted with broad discretion," and "[t]he sheriff did not rely on her for

20

assistance in implementing his law enforcement platform." Id. at 550. We therefore determined that the sheriff had not established as a matter of law that political loyalty was an appropriate requirement for Knight's performance of her job as a jailer.

We conclude that the near identity between the duties of the deputy plaintiffs in this case and Knight's duties warrants the same result here. Although Sheriff Roberts points to various differences between Knight and the plaintiffs here that he claims make this case more like Jenkins and less like Knight, we conclude that none of them is sufficiently significant to justify a different outcome.

First, although the Sheriff correctly points out that Carter, McCoy, and Dixon were all sworn deputies, the oath that they took was simply to support the federal and Virginia constitutions and faithfully and impartially discharge their duties to the best of their ability. See Va. Code Ann. § 49-1; Thore v. Chesterfield Cnty. Bd. of Supervisors, 391 S.E.2d 882, 883 (Va. Ct. App. 1990). No one contends that these men took a law enforcement officer's oath, as the Jenkins plaintiffs did. See N.C. Gen. Stat. § 11-11. In any event, in Knight we specifically rejected the argument that the result in Knight would have been different even had Knight taken a law enforcement officer's oath, noting that it is the specific

21

duties of the public employees that must be the focus of the Elrod-Branti inquiry.  See Knight, 214 F.3d at 551.  Because Knight's duties were "essentially custodial" and she, unlike the deputies in Jenkins, was not empowered to stand in for the sheriff on a broad front, we held that she could not be required to be politically loyal to the sheriff.  Id.

Sheriff Roberts notes that the deputies in the present case, like those in Jenkins, were entitled to stand in for their sheriff in one way that Knight could not, namely, by making an arrest.  It is true that in Virginia sheriff's deputies are, like sheriffs, statutorily authorized to make arrests under a wide range of circumstances.  See Va. Code Ann. § 19.2-81(A)(2). That all deputies have been granted general arrest powers by statute, however, does not mean that exercising those powers was an appreciable part of the duties of their particular positions. In fact, Carter, McCoy, and Dixon were trained as jailers, and it is undisputed that they did not take the "Basic Law Enforcement" course that the Virginia Department of Criminal Justice Services requires officers to take before they may exercise the statutorily granted general arrest power.  And, while the evidence in the record was that the deputies were authorized to make arrests for offenses occurring before them in the course of their "everyday responsibilities," J.A. 297, the Plaintiffs offered evidence that their technical authorization

22

to make arrests had no appreciable effect whatsoever on the job duties of their position. According to the declarations of Carter, McCoy, and Dixon, not only had none of them ever made an arrest, but they were not even aware they had the authority to do so. In fact, Adams stated in his declaration that in his 16 years at the Hampton Sheriff's Office, during which he rose to the level of third most senior officer, he could not recall a sheriff's deputy making a single arrest. Thus, at this stage of the litigation, the Sheriff has not established that the jailers' arrest duties were sufficiently significant that they would affect whether their political allegiance to the Sheriff was an appropriate requirement for the effective performance of their jobs.

The Sheriff also notes that Carter, McCoy, and Dixon each sought and received approval to perform "'Extra Duty Employment' comprising security work outside of the Sheriff's Office during which they were in uniform and armed." J.A. 84. It is hard to see how this fact could significantly impact our Elrod-Branti analysis at this stage, however, considering that the record is silent concerning what duties the plaintiff deputies had concerning this "extra" work. Moreover, the Sheriff did not make any showing that such apparently optional work "outside of the Sheriff's Office," J.A. 84, was part of "the specific duties of the public employee[s'] position." Knight, 214 F.3d at 549.

23

In sum, we hold that at this stage of the litigation, the Sheriff has not demonstrated that the duties of Carter, McCoy, and Dixon differed from Knight's duties in any significant way, and we conclude that Sheriff Roberts has not shown that their duties resembled those of "a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation [or political allegiance] is an equally appropriate requirement." Stott, 916 F.2d at 142. Accordingly, he also has not demonstrated that political allegiance was an appropriate requirement for the jailers' performance of their jobs. Accord Diruzza v. County of Tehama, 206 F.3d 1304, 1310-11 (9th Cir. 2000) (holding that sheriff did not establish application of Elrod-Branti exception as a matter of law in the case of a California deputy sheriff who worked as a jailer). Thus, we hold that the Sheriff was not entitled to summary judgment on the basis that he could terminate Carter, McCoy, and Dixon for their lack of political allegiance to him.

2. Causation

We now turn to the issue of whether the Plaintiffs' lack of political allegiance to the Sheriff was a substantial basis for the Sheriff's decision not to reappoint them. See Wagner, 13 F.3d at 90. For reasons that we will explain, we conclude that Carter, McCoy, and Dixon have all at least created a genuine

24

factual dispute regarding whether lack of political allegiance was a substantial basis for their non-reappointment, but that Sandhofer, Woodward, and Bland have not.

Carter and McCoy

In the late summer of 2009, Carter and McCoy visited Adams's campaign Facebook page and made statements on the page indicating their support for his campaign. Specifically, Carter "liked" the page and "wrote and posted a message of encouragement" that he signed. J.A. 570. McCoy also "posted an entry on the page indicating [his] support for [Adams's] campaign." J.A. 586.[7] Carter's and McCoy's Facebook actions became well-known in the Sheriff's Office as many were shocked because "they appeared not to be supporting the sheriff." J.A. 681.[8] Colonel Bowden, who was the second most senior officer in the Sheriff's Office, learned of Carter's and McCoy's presence on Adams's Facebook Page and informed Sheriff Roberts.

---

[7] Both men also verbally expressed their support for Adams to several people, and although both had volunteered and worked vigorously for Roberts's past campaigns, they did not volunteer at all for Roberts in the 2009 election.

[8] McCoy testified that he "was approached by ten or 15 people" who asked him why he would risk his job with the posting when he was only 18 months away from becoming eligible for retirement. J.A. 162. Indeed, McCoy eventually took his posting down.

25

In the late summer of 2009, Carter and Ramona Jones[9] – also a Hampton sheriff's deputy – co-hosted a cookout ("the August cookout") attended by many Sheriff's Office employees, including Adams. The next day at work, Jones was approached by her supervisor, Lieutenant Crystal Cooke, who told Jones that she had heard that Adams had attended her cookout. Jones truthfully told Cooke that Carter had invited Adams. Shortly thereafter, then-Captain Kenneth Richardson approached Jones and asked her who had attended. She told him that Adams had been there, and Richardson "state[d] that the event had the appearance of a campaign event and said specifically that 'it does not look good.'" J.A. 702. Jones told Richardson, as she had told Cooke, that it was Carter who had invited Adams, and Richardson responded that Jones "needed to explain that to the Sheriff." J.A. 702. Indeed, the Sheriff learned about the cookout and that Adams had attended. Pictures showing Sandhofer and McCoy at the event were posted on Facebook by early October.

In early September, Sheriff Roberts addressed his employees' support for Adams in speeches he gave during the various shift changes. He expressed his disapproval with the decision of some to support Adams's candidacy on Facebook. He stated that he would be sheriff for as long as he wanted and

_____

[9] Jones was named Ramona Larkins at the time.

26

thus that his train was the "long train." J.A. 572 (internal quotation marks omitted). He indicated that Adams's train was the "short train" and that those who openly supported Adams would lose their jobs. J.A. 572 (internal quotation marks omitted). Additionally, after the conclusion of the meeting that occurred before Carter's shift change, the Sheriff angrily approached Carter and "ma[de] several intimidating statements." J.A. 572. He then added, "You made your bed, and now you're going to lie in it – after the election, you're gone." J.A. 572 (internal quotation marks omitted).

The Sheriff represented that his heated exchange with Carter after one of Roberts's "long train" speeches pertained to Carter's objections about disciplinary proceedings concerning Carter's wife rather than to Carter's support of Adams.[10] Indeed, the Sheriff testified that that conversation was the reason that he chose not to reappoint Carter. Carter flatly denied that Roberts made any reference to Carter's wife during that conversation, however.[11]

---

[10] Carter's wife was also a Sheriff's Office employee.

[11] According to Carter's declaration, Carter worked for the Sheriff's Office for more than 11 years, performed his job "in an exemplary manner," and always received performance evaluations of "above average." J.A. 568. Neither his first- nor his second-level supervisor indicated at any time prior to his termination that they had any concerns regarding his performance. Carter conceded that he had had several
(Continued)

27

If a jury credited Carter's account of their heated exchange, however, it could reasonably conclude that Roberts was not telling the truth in an attempt to cover up his illegal retaliation.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (explaining that "[p]roof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive").  The Sheriff, after all, had specifically warned his employees not to support Adams through Facebook and had told Carter that his support for Adams would cost him his job.  For these reasons, we conclude that a reasonable jury could find that Carter's lack of political allegiance to the Sheriff was a substantial motivation for the Sheriff's decision not to reappoint him.

Based on the evidence of Roberts's strong animus toward those of his employees who supported Adams, a reasonable jury could also conclude that Roberts's knowledge of McCoy's support for Adams would have strongly motivated Roberts not to reappoint McCoy.  Roberts claimed his primary reason for not reappointing

---

disciplinary actions taken against him for mistakes he made in allowing prisoners to be released prematurely.  However, the only formal discipline in his record was more than five years old at the time he was not reappointed, and the Sheriff did not testify that those past disciplinary actions played any part in his decision not to reappoint Carter.

28

McCoy was that McCoy had had "heated arguments with deputies when he was in civil" and that Roberts "switched him up and brought him back to corrections." J.A. 102. McCoy, however, stated that he had worked in the Sheriff's Office for more than 21 years and always received "above average" or "outstanding" evaluations, and that at no time prior to his non-reappointment did his immediate supervisor or second-level supervisor indicate that they had any problems with his performance. In light of the Sheriff's threat that supporters of Adams would lose their jobs and his specific statement of disapproval of employees being on Adams's Facebook page, we conclude that a reasonable jury could conclude that McCoy's lack of political allegiance to Roberts was a substantial motivation for the Sheriff's decision not to reappoint him.

### Dixon

Plaintiffs presented evidence that Dixon performed his job "in an exemplary manner" during his more than 13 years with the Sheriff's Office, always earning performance evaluations of at least "above average" and earning a rating of "outstanding" in his last evaluation. At no time did his first- or second-level supervisor express concerns with his performance.

Dixon voiced his opposition to Sheriff Roberts's candidacy on Election Day to Frances Pope, who was working the polls for Roberts's campaign. On Dixon's way out, referring to the

29

Sheriff's campaign material, he told Pope that she should "just throw that stuff away" ("the polling-place comment"). J.A. 581 (internal quotation marks omitted). Dixon spoke in a friendly, nonconfrontational tone and did not use any expletives. Dixon also had an Adams bumper sticker on his car that he was "pretty sure people saw." J.A. 148.

The Sheriff denies that Dixon was not reappointed because of his lack of political allegiance. Rather, the Sheriff represents that Dixon in fact was let go because he used profanity in making the polling-place comment, although the Sheriff does not indicate the source of his belief and admits that he never sought Dixon's side of the story before replacing him.[12] See Appellee's brief at 10; J.A. 99 (stating that "[I]t was [the Sheriff's] understanding" that Dixon said, "You can take this f---ing s---, stuff, and throw it in the trash can."). For his part, Dixon denies using any profanity in making the polling-place comment. We conclude that if a jury credited Dixon's testimony, it could also reasonably find that the Sheriff knew Dixon had not used profanity and that his support for Adams, as revealed by the polling-place comment and bumper

---

[12] The Sheriff testified that he also considered the fact that Dixon transferred multiple times between working in the jail and in civil process after requesting to be a training officer but later deciding that he could not handle the pressures of that position.

30

sticker, substantially motivated him not to reappoint Dixon. See Reeves, 530 U.S. at 147.

## Sandhofer

In contrast, we conclude that Plaintiffs have failed to create a genuine factual dispute regarding whether Sandhofer's political disloyalty to Sheriff Roberts was a substantial basis for his non-reappointment. The Sheriff had used Sandhofer – who had experience working for a downtown marketing organization – for significant marketing efforts and fundraising in 2008. As a result, Colonel Bowden asked Sandhofer in 2009 to obtain prominent sign locations among downtown Hampton businesses in conjunction with the 2009 election. Sandhofer agreed to help the Sheriff in this way, even though he actually never followed through. Sandhofer also was ordered by Lieutenant Miranda Harding to work the polls on Election Day, but he declined on the basis that his "family comes first." J.A. 169. Additionally, he verbally expressed his support for Adams to several people, as discreetly as possible, and he attended the August cookout and was depicted in pictures of the cookout posted on Facebook. Plaintiffs further point out that Sandhofer's girlfriend drove him to work and to campaign debates in her car, which had an Adams bumper sticker affixed to it. Sergeant John Meyers "mentioned" the sticker to Sandhofer on at least one occasion. J.A. 591.

31

We conclude that this evidence is simply too thin to create a genuine factual dispute regarding whether Sandhofer's lack of political allegiance to the Sheriff was a substantial basis for his non-reappointment. Sandhofer admitted attending a reception for the Sheriff's campaign at the mayor's house at the Sheriff's request. And, he admitted agreeing to help the Sheriff locate signs for the 2009 election, although he never actually located any of the signs. Furthermore, while he refused to work the polls on Election Day, the reason he gave had nothing to do with supporting Adams. Without more, there simply is not sufficient evidence that the Sheriff identified Sandhofer as an Adams supporter, even assuming that the Sheriff believed his girlfriend was supporting Adams. And there was no reasonable basis for a jury to conclude that the Sheriff would have declined to reappoint Sandhofer based simply on his lack of affirmative assistance to the Sheriff's 2009 campaign. We therefore conclude that the district court properly granted summary judgment to the Sheriff on Sandhofer's claim.

## Woodward

We also conclude that Woodward did not create a genuine factual dispute concerning whether her lack of political allegiance to the Sheriff was a substantial basis for her non-reappointment.

32

During her more than 11 years with the Sheriff's Office, Woodward's performance evaluations had always been "above average" or "outstanding." J.A. 601 (internal quotation marks omitted). According to Woodward, "[i]t was very well known within the office that [she] was close to Jim Adams." J.A. 600. In early 2009, Woodward's former supervisor and mentor, Deborah Davis, became the treasurer of Adams's campaign. Woodward also informed several of her coworkers that she supported Adams's candidacy, although she generally tried to keep her support quiet to protect her job.

During Roberts's prior campaigns, Woodward had worked "tireless[ly]" handing out flyers, working the polls, placing yard signs, attending campaign events, and selling and purchasing tickets. J.A. 599. In light of her support for Adams, however, she did none of those things in 2009, except for purchasing golf tournament tickets (because she felt coerced).

In the summer of 2009, Woodward noticed that her colleague, Lieutenant George Perkins, was circulating a petition to place the Sheriff's name on the ballot. Woodward complained to Sergeant Sharon Mays, Sergeant Meyers, Perkins himself, and others, on the basis that Perkins was not a Hampton resident and only Hampton residents could circulate such petitions. She also learned that another non-resident was circulating petitions and she had various conversations with Mays about that as well.

33

In the end, however, we conclude that it would be mere speculation for a jury to conclude that Woodward was let go because of lack of political allegiance to Roberts. Outside of her petition complaints, there is no significant evidence that would support an inference that the Sheriff believed Woodward was supporting Adams. Woodward conceded that she shared her preference for Adams only with people she thought would keep her feelings secret. And Woodward maintained that the petition complaints were not based on the fact that Roberts was the subject of the petitions but on the principle that they should not be circulated in the workplace by a non-Hampton resident. There is no evidence that the Sheriff or others did not take her complaints at face value or otherwise assumed that her true goal was to work against Roberts's campaign.

The Sheriff testified that the reason he did not reappoint Woodward and Bland was that he expected that the number of deputies he would be allocated by the Compensation Board would be reduced, based on the declining population of the Hampton City Jail. See Va. Code Ann. § 15.2-1609.1. Woodward and Bland counted against that allotment and the Sheriff maintains that he decided he needed to have deputies in Woodward's and Bland's positions. Although Woodward's and the Sheriff's accounts are in conflict concerning whether he ever offered Woodward the opportunity to become a deputy, we conclude that that conflict

34

is simply not a sufficient basis for a reasonable inference that her lack of political allegiance to Roberts was a substantial motivation for her non-reappointment.

## Bland

Finally, we determine that Plaintiffs failed to create a genuine factual issue concerning whether a lack of political allegiance was a substantial basis for the Sheriff's decision not to reappoint Bland. Bland had a financial position in the Sheriff's Office Administration Division. He had worked with the Sheriff's Department for more than nine years, performed "in an exemplary manner," and received performance evaluations of "above average." Bland had declined to provide significant volunteer assistance to the Sheriff's 2009 campaign after having provided many types of support for the Sheriff's past campaigns. He was also known to be very close to Deborah Davis, who had left the Sheriff's Office in 2008 to become Adams's campaign treasurer in early 2009.

However, Bland admitted purchasing raffle tickets for the Sheriff's fundraising golf tournament, and he also admitted helping to set up electronic equipment the night of the election. He further admitted that he did not actively support Adams's campaign in any way and that Woodward was the only

person he even told of his intention to vote for Adams.[13] Something more would be necessary in order to warrant a reasonable inference that Bland's lack of political allegiance to Sheriff Roberts was a substantial basis for the Sheriff's decision not to reappoint him.

B.   Merits of Free-Speech Claims

The Plaintiffs next argue that the district court erred in granting summary judgment against them on their speech claims. We conclude that Carter, McCoy, and Dixon at least created genuine factual disputes regarding whether the Sheriff violated their free-speech rights, but that Woodward did not.

### Carter

The first question to be addressed with regard to the speech claims is whether the conduct that the employee maintains precipitated his non-reappointment constituted speech at all. Carter's conduct consisted of his "liking" Adams's campaign page on Facebook. The district court concluded that "merely 'liking' a Facebook page is insufficient speech to merit constitutional protection" and that the record did not sufficiently describe what statement McCoy made. Bland, 857 F. Supp. 2d at 603. To consider whether this conduct amounted to speech, we first must

---

[13] Indeed, even Bland's wife did not know that he favored Adams.

36

understand, as a factual matter, what it means to "like" a Facebook page.

"Facebook is an online social network where members develop personalized web profiles to interact and share information with other members." Lane v. Facebook, Inc., 696 F.3d 811, 816 (9th Cir. 2012). Members can share various types of information, including "news headlines, photographs, videos, personal stories, and activity updates." Id. Daily more than 500 million Facebook members use the site and more than three billion "likes" and comments are posted. See Brief of Facebook, Inc. as Amicus Curiae, at 3.

Every Facebook user has a profile, which "typically includes, among other things, the User's name; photos the User has placed on the website (including one photo that serves as the User's profile photo); a brief biographical sketch; a list of individual Facebook Users with whom the User [interacts, known as 'friends']; and . . . a list of Facebook 'Pages' the User has Liked." Id. at 4 (footnote omitted). "[B]usinesses, organizations and brands," can also use "Pages" for similar purposes. What is a Facebook Page?, Facebook, http://www.facebook.com/help/281592001947683 (last visited Sept. 17, 2013).

When a user logs on to Facebook, his home page is the first thing that he typically sees. Included on a home page is a news

feed, "which, for most Users, is the primary place where they see and interact with news and stories from and about their Friends and Pages they have connected with on Facebook." Brief of Facebook, Inc. as Amicus Curiae, at 5; see What is News Feed, Facebook, http://www.facebook.com/help/327131014036297 (last visited Sept. 17, 2013). It "is a constantly updating list of stories from people and Pages that [the User] follow[s] on Facebook." What is News Feed?, Facebook, http://www.facebook.com/help/327131014036297 (last visited Sept. 17, 2013).

"Liking" on Facebook is a way for Facebook users to share information with each other. The "like" button, which is represented by a thumbs-up icon, and the word "like" appear next to different types of Facebook content. Liking something on Facebook "is an easy way to let someone know that you enjoy it." What does it mean to "Like" something?, Facebook, http://www.facebook.com/help/452446998120360 (last visited Sept. 17, 2013). Liking a Facebook Page "means you are connecting to that Page. When you connect to a Page, it will appear in your timeline and you will appear on the Page as a person who likes that Page. The Page will also be able to post content into your News Feed." What's the difference between liking an item a friend posts and liking a Page?, Facebook,

38

http://www.facebook.com/help/452446998120360 (last visited Sept. 17, 2013).

Here, Carter visited the Jim Adams's campaign Facebook page (the "Campaign Page"), which was named "Jim Adams for Hampton Sheriff," and he clicked the "like" button on the Campaign Page. When he did so, the Campaign Page's name and a photo of Adams – which an Adams campaign representative had selected as the Page's icon – were added to Carter's profile, which all Facebook users could view. On Carter's profile, the Campaign Page name served as a link to the Campaign Page. Carter's clicking on the "like" button also caused an announcement that Carter liked the Campaign Page to appear in the news feeds of Carter's friends. And it caused Carter's name and his profile photo to be added to the Campaign Page's "People [Who] Like This" list.

Once one understands the nature of what Carter did by liking the Campaign Page, it becomes apparent that his conduct qualifies as speech.[14] On the most basic level, clicking on the "like" button literally causes to be published the statement that the User "likes" something, which is itself a substantive statement. In the context of a political campaign's Facebook

_____

[14] The Supreme Court has rejected the notion that online speech is somehow not worthy of the same level of protection as other speech. See Reno v. ACLU, 521 U.S. 844, 870 (1997); see also Ashcroft v. ACLU, 542 U.S. 656 (2004).

39

page, the meaning that the user approves of the candidacy whose page is being liked is unmistakable. That a user may use a single mouse click to produce that message that he likes the page instead of typing the same message with several individual key strokes is of no constitutional significance.

Aside from the fact that liking the Campaign Page constituted pure speech, it also was symbolic expression. The distribution of the universally understood "thumbs up" symbol in association with Adams's campaign page, like the actual text that liking the page produced, conveyed that Carter supported Adams's candidacy. See Spence v. Washington, 418 U.S. 405, 410-11 (1974) (per curiam) (holding that person engaged in expressive conduct when there was "[a]n intent to convey a particularized message . . ., and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it"); see also Tobey v. Jones, 706 F.3d 379, 388 n.3 (4th Cir. 2013).

In sum, liking a political candidate's campaign page communicates the user's approval of the candidate and supports the campaign by associating the user with it. In this way, it is the Internet equivalent of displaying a political sign in one's front yard, which the Supreme Court has held is substantive speech. See City of Ladue v. Gilleo, 512 U.S. 43, 54-56 (1994). Just as Carter's placing an "Adams for Sheriff"

40

sign in his front yard would have conveyed to those passing his home that he supported Adams's campaign, Carter's liking Adams's Campaign Page conveyed that message to those viewing his profile or the Campaign Page.[15]  In fact, it is hardly surprising that the record reflects that this is exactly how Carter's action was understood.  See J.A. 160 (McCoy's testimony that in light of Carter's liking Adams's Campaign Page, "everybody was saying that . . . Carter is out of there because he supported Adams openly"); see also J.A. 793 (Sheriff's Office employee stating that Roberts had said that "certain employees were on the Facebook page of his opponent, Jim Adams, indicating their support of Adams for Sheriff").

---

[15]  Indeed, in holding that an ordinance banning signs at residences except for those signs fitting within particular exceptions violated the plaintiff-resident's free-speech rights, the Gilleo Court highlighted several aspects of displaying political signs at one's residence that apply as well to liking a Facebook campaign page:

> Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means.  Precisely because of their location, such signs provide information about the identity of the "speaker."  . . .

> Residential signs are an unusually cheap and convenient form of communication.  Especially for persons of modest means or limited mobility, a yard or window sign may have no practical substitute.

City of Ladue v. Gilleo, 512 U.S. 43, 56-57 (1994).

41

The second part of McVey's first prong, concerning whether Carter was speaking as a private citizen on a matter of public concern, need not detain us long. The Sheriff does not dispute that Carter's speech, if it was speech, was made in his capacity as a private citizen. Cf. Garcetti v. Ceballos, 547 U.S. 410, 421 (2006) (holding that employee does not speak as a private citizen when his speech is "pursuant to [his] official duties"). And, it is well established that an employee can speak as a private citizen in his workplace, even if the content of the speech is "related to the speaker's job." Id.; see Pickering, 391 U.S. at 564-65 (holding that letter to local newspaper from teacher concerning school board policies was protected speech). Further, the idea expressed in Carter's speech – that he supported Adams in the 2009 election – clearly related to a matter of public concern. See Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 329 (2010) (describing political speech as "central to the meaning and purpose of the First Amendment"); McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 346 (1995) ("Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the

42

bringing about of political and social changes desired by the people." (internal quotation marks omitted)).

Next, on the record before us, Carter's interest in expressing support for his favored candidate outweighed the Sheriff's interest in providing effective and efficient services to the public. Carter's speech was political speech, which is entitled to the highest level of protection. See Meyer v. Grant, 486 U.S. 414, 422, 425 (1988) (describing constitutional protection of "core political speech" as being "at its zenith" (internal quotation marks omitted)); see also Connick, 461 U.S. at 152 ("We caution that a stronger showing [of disruption] may be necessary if the employee's speech more substantially involved matters of public concern."). Indeed, the public's interest in Carter's opinions regarding the election may have had particular value to the public in light of his status as a Sheriff's Office employee. See, e.g., Waters v. Churchill, 511 U.S. 661, 674 (1994) (plurality opinion) ("Government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions."). In contrast, despite the Sheriff's reference to the need for harmony and discipline in the Sheriff's Office, nothing in the record in this case indicates that Carter's Facebook support of Adams's campaign did anything in particular to disrupt the office or would have made it more

43

difficult for Carter, the Sheriff, or others to perform their work efficiently. See Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 356 (4th Cir. 2000) (holding that "generalized and unsubstantiated interests" "in maintaining morale and efficiency" within the fire department did not outweigh plaintiff's speech interest). The Sheriff's case in this regard is especially weak considering that he has failed to show that the jailers occupied any "confidential, policymaking, or public contact role" in the Sheriff's Office. McVey, 157 F.3d at 278.

Finally, for the same reasons that we hold that Carter has created a genuine factual issue regarding whether he was terminated because of his lack of political allegiance to the Sheriff, we conclude that Carter has created a genuine factual issue concerning whether his Facebook support for Adams was also a substantial factor. The Sheriff warned Carter that his support of Adams would cost him his job, and a jury reasonably could take the Sheriff at his word.

### McCoy

Our application of the McVey test to McCoy's speech claim is very similar to our application of it to Carter's. McCoy presented evidence that he engaged in First Amendment speech when he "went on Jim Adams' campaign Facebook page and posted an entry on the page indicating [his] support for his campaign."

44

J.A. 586; see also J.A. 156 (stating that he "went on [Adams's] Facebook page" and "posted [his] picture . . . as a supporter"). Indeed, the evidence indicated that many in the Sheriff's Office were "shocked" by the posting because it indicated that McCoy was "not . . . supporting the sheriff." J.A. 681. The district court concluded that McCoy did not sufficiently allege that he engaged in speech because the record did not sufficiently describe what statement McCoy made. See Bland, 857 F. Supp. 2d at 604.

Certainly a posting on a campaign's Facebook Page indicating support for the candidate constitutes speech within the meaning of the First Amendment.[16] For the same reasons as applied to Carter's speech, McCoy's speech was made in his capacity as a private citizen on a matter of public concern, namely, whether Adams should be elected Hampton Sheriff. That the record does not reflect the exact words McCoy used to express his support for Adams's campaign is immaterial as there is no dispute in the record that that was the message that McCoy

---

[16] At oral argument, the Sheriff argued for the first time that McCoy did not actually intend his statement of support to be posted on the Campaign Page, and thus that the message did not constitute speech. That McCoy may have intended his expression of support to be kept private rather than made public, however, does not deprive it of its status as speech. See, e.g., Rankin v. McPherson, 483 U.S. 378, 387 (1987) (holding that constable's office employee engaged in protected speech when she made a private political remark that was overheard by a third person she did not realize was in earshot).

45

conveyed. Additionally, although many were shocked that McCoy would so openly support Sheriff Roberts's opponent, nothing in the record indicates that his speech created any sort of disruption or explains how the Sheriff's interest in operating the Sheriff's Office efficiently could outweigh McCoy's interest in supporting the Sheriff's opponent in the election. See Goldstein, 218 F.3d at 356.

Further, for the same reasons that we conclude that a reasonable jury could find that McCoy's political disloyalty was a substantial motivation for the Sheriff's decision not to reappoint him, such a jury could also find that McCoy's (politically disloyal) speech was also a substantial motivation for his non-reappointment. With the Sheriff having specifically warned his employees not to support Adams through Facebook and having threatened that Adams supporters would not be reappointed, a jury could reasonably find that the Sheriff simply followed through with his threat by not reappointing McCoy.

### Dixon

Dixon alleges he was not reappointed because he displayed an Adams bumper sticker on his car and because he made the polling-place comment. The district court concluded that there was no evidence that Roberts or other senior Sheriff's Office employees had knowledge of his bumper sticker and that the

46

polling-place comment was merely a personal grievance rather than a statement touching on a matter of public concern. See Bland, 857 F. Supp. 2d at 605.

Although the evidence that the Sheriff or his senior officers knew of Dixon's bumper sticker was thin, to say the least, the Sheriff admits that he terminated Dixon because of the polling-place comment. And, the statement that Pope should "just throw [her Roberts campaign materials] away" clearly constituted speech on a matter of public concern – the merits of Roberts's campaign – made in Dixon's capacity as a private citizen. See McIntyre, 514 U.S. at 346; cf. Cohen v. California, 403 U.S. 15, 18 (1971) (concluding that California "lack[ed] power to punish" the wearing of a jacket bearing the plainly visible words "F - - k the Draft" based on "the underlying . . . evident position on the inutility or immorality of the draft"). Dixon represented that he made the statement in a nonconfrontational, friendly manner, and no specific evidence in the record indicated how his support for Adams might have created a lack of harmony in the Hampton Sheriff's Office.

As for causation, the Sheriff does not deny the fact that Dixon's polling-place comment was the reason he was not reappointed. The Sheriff simply maintained that he believed Dixon used profanity in making the comment – although he does not explain the source of his belief. Were a jury to credit

47

Dixon's denial of that charge, it could reasonably conclude that what actually motivated the Sheriff not to reappoint Dixon was the fact that Dixon voiced his disapproval of the Sheriff's candidacy.

### Woodward

Woodward's alleged protected speech occurred when she complained about Lieutenant George Perkins's circulation of a petition in support of Sheriff Roberts on the basis that Perkins was not a Hampton resident. As we have already explained, however, we conclude that it would be speculative for a jury to conclude that Woodward's complaint regarding the petition was based on anything other than the reasons she voiced at the time, which were unrelated to the question of whether she supported Adams or Roberts in the election. We therefore conclude she has not created a genuine factual dispute regarding whether her complaint was a substantial motivation for her non-reappointment.

C. Eleventh Amendment Immunity

Plaintiffs next argue that the district court erred in ruling that Eleventh Amendment immunity would bar claims advanced against the Sheriff in his official capacity. We agree to the extent that the Plaintiffs seek the remedy of reinstatement.

The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Eleventh Amendment immunity protects unwilling states from suit in federal court. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 70-71 (1989); Edelman v. Jordan, 415 U.S. 651, 662-63 (1974).[17] This immunity also protects "state agents and state instrumentalities," Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997), meaning that it protects "arm[s] of the State" and State officials, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977). When a judgment against a governmental entity would have to be paid from the State's treasury, the governmental entity is an arm of the State for Eleventh Amendment purposes. See Cash v. Granville Cnty. Bd. of Educ., 242 F.3d 219, 223 (4th Cir. 2001). The Supreme Court, however, delineated an exception to the application of the Eleventh Amendment in Ex parte Young, 209 U.S. 123 (1908). That exception "permits a federal court to issue prospective,

---

[17] Although the language of the Eleventh Amendment does not explicitly apply to suits brought against a state by one of its own citizens, the Amendment has been construed to bar such suits. See Equity in Athletics, Inc. v. Department of Educ., 639 F.3d 91, 107 n.12 (4th Cir. 2011).

injunctive relief against a state officer to prevent ongoing violations of federal law, on the rationale that such a suit is not a suit against the state for purposes of the Eleventh Amendment." McBurney v. Cuccinelli, 616 F.3d 393, 399 (4th Cir. 2010).[18] The operation of the Eleventh Amendment in this case thus depends on whether Sheriff Roberts is an arm of the State and, if so, whether the Ex Parte Young exception applies.

The district court determined that Virginia sheriffs are constitutional officers, see Va. Const. Art. VII § 4; Va. Code Ann. § 15.2-1609; Jenkins v. Weatherholtz, 909 F.2d 105, 107 (4th Cir. 1990), and that sheriffs are arms of the State, see Blankenship v. Warren Cnty., 918 F. Supp. 970, 973-74 (W.D. Va. 1996). The district court also determined that "the State would be liable to pay adverse judgments won against the Sheriff in his official capacity." Bland, 857 F. Supp. 2d at 610. Thus, the court concluded, "a suit against the Sheriff in his official capacity is in fact a suit against the State." Id. Finding no

---

[18] "[A] State's sovereign immunity is a personal privilege which it may waive at pleasure." College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675 (1999) (internal quotation marks omitted). However, there is no indication of any waiver in this case. Nor has there been any Congressional abrogation of the Commonwealth's immunity. See Lee-Thomas v. Prince George's Cnty. Pub. Sch., 666 F.3d 244, 249 (4th Cir. 2012) ("'Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority.'" (quoting Board of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001)).

evidence of abrogation or waiver of immunity by the Commonwealth, the district court reasoned that "the Sheriff is immune from suit for claims against him in that capacity." Id.

Plaintiffs do not dispute that the Commonwealth would be liable to pay any money judgment against the Sheriff. However, citing Edelman, 415 U.S. at 664-65, Plaintiffs contend that Eleventh Amendment immunity does not apply to the claims against the Sheriff in his official capacity because Plaintiffs' requests for reinstatement and lost pay are equitable claims to which the immunity does not apply.

Because reinstatement is a form of prospective relief, the refusal to provide that relief when it is requested can constitute an ongoing violation of federal law such that the Ex Parte Young exception applies. See Coakley v. Welch, 877 F.2d 304, 307 (4th Cir. 1989); State Emps. Bargaining Agent Coal. v. Rowland, 494 F.3d 71, 96 (2d Cir. 2007). Plaintiffs are therefore correct that the Sheriff is not entitled to Eleventh Amendment immunity to the extent that they seek reinstatement. See Coakley, 877 F.2d at 307; State Emps. Bargaining Agent Coal., 494 F.3d at 96. As we have explained, however, to the extent that the claims seek monetary relief, they are claims against an arm of the State. See Cash, 242 F.3d at 223. Thus, to the extent that the claims seek monetary relief against the Sheriff in his official capacity, the district court correctly

51

ruled that the Sheriff is entitled to Eleventh Amendment immunity.

D.   Qualified Immunity

The Sheriff argues that even if some of the Plaintiffs created genuine factual disputes concerning whether he violated their association or free-speech rights by not reappointing them, he is nevertheless entitled to qualified immunity to the extent that the claims are asserted against him in his individual capacity.

A government official who is sued in his individual capacity may invoke qualified immunity. See Ridpath, 447 F.3d at 306. "Qualified immunity protects government officials from civil damages in a § 1983 action insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Edwards v. City of Goldsboro, 178 F.3d 231, 250 (4th Cir. 1999) (internal quotation marks omitted). In determining whether a defendant is entitled to qualified immunity, a court must decide (1) whether the defendant has violated a constitutional right of the plaintiff and (2) whether that right was clearly established at the time of the alleged misconduct. See Walker v. Prince George's Cnty., 575 F.3d 426, 429 (4th Cir. 2009). However, "judges of the district courts and the courts of appeals [are] permitted to exercise their sound discretion in deciding which

52

of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

In analyzing whether the defendant has violated a constitutional right of the plaintiff, the court should identify the right "at a high level of particularity." Edwards, 178 F.3d at 251. For a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal quotation marks omitted).

We conclude that the Sheriff is entitled to qualified immunity concerning Carter's, McCoy's, and Dixon's claims because in December 2009 a reasonable sheriff could have believed he had the right to choose not to reappoint his sworn deputies for political reasons, including speech indicating the deputies' support for the Sheriff's political opponent.

Simply put, Jenkins sent very mixed signals. Although we conclude today for the reasons discussed earlier that Jenkins is best read as analyzing the duties of the particular deputies before the court, much of the opinion's language seemed to indicate that a North Carolina sheriff could terminate his deputies for political reasons regardless of the duties of their particular positions. Truthfully, the Jenkins majority opinion

reads almost like two separate opinions that are in tension with one another. All of the majority's analysis up to the opinion's final page concerns deputies generally or North Carolina deputies, and references particular duties of deputies without indicating that the plaintiffs had those duties, see, e.g., 119 F.3d at 1162 ("The sheriff is likely to include at least some deputies in his core group of advisors. Deputies on patrol work autonomously, exercising significant discretion in performing their jobs." (footnote omitted)). This analysis leads up to the broad conclusion that "North Carolina deputy sheriffs may be lawfully terminated for political reasons under the Elrod-Branti exception to prohibited political terminations." Id. at 1164. The majority rejected our earlier decision in Jones v. Dodson, 727 F.2d 1329 (4th Cir. 1984), where we concluded that no deputy could ever be a policymaker and held instead that "district courts are to engage in a Stott-type analysis, examining the specific position at issue, as we have done here today." Jenkins, 119 F.3d at 1164. The majority later announced an even broader "h[o]ld[ing]" possibly not even limited to North Carolina sheriffs when it declared that "newly elected or re-elected sheriffs may dismiss deputies either because of party affiliation or campaign activity." Id.

As if this language were not already strong support for a broader reading of Jenkins, as we have pointed out, the dissent

54

in *Jenkins* read it that way as well, accusing the majority of "hold[ing] that *all* deputy sheriffs in North Carolina – regardless of their actual duties – are policymaking officials." *Id.* at 1166 (Motz, J., dissenting); see also *id.* ("This all-encompassing holding is made without any inquiry into the actual job duties of the deputies before us."); *id.* ("The majority . . . engages in no analysis of the particular duties of each deputy."); *id.* ("[T]he majority . . . finds that *all* North Carolina deputy sheriffs are policymakers – without ever considering the positions held by each of the deputies at issue or their specific job duties.").

Additionally, *Knight v. Vernon*, while important to our decision regarding the *merits* of Carter's, McCoy's, and Dixon's constitutional claims, did not *clearly establish* that the broader reading of *Jenkins* was incorrect. Although Knight worked in a sheriff's office, she was not a deputy. See *Knight*, 214 F.3d at 546. It is true that the *Knight* majority opined that Knight's sheriff would not have had the right to fire her for political reasons even if she had taken the oath of a law enforcement officer (like the plaintiffs in *Jenkins* took and like the *Knight* dissent concluded Knight took). See *id.* at 551; *id.* at 555 (Widener, J., concurring and dissenting). But the *Knight* majority's explanation for why it was immaterial whether Knight had taken the law enforcement officer oath could itself

55

be reasonably taken as support for the broad reading of Jenkins.

The Knight majority stated:

> As we emphasized in Jenkins, we "examine the job duties of the position," 119 F.3d at 1165, and Ms. Knight's duties as a jailer were essentially custodial. She simply lacked the special status of a deputy sheriff, who is empowered to stand in for the sheriff on a broad front.

Id. at 551 (emphasis added). A sheriff reasonably reading Jenkins as painting all deputies with a broad brush could well have viewed Knight as doing the same, or, at the very least, not weighing in on the issue. See also id. at 550 ("The responsibilities of a jailer, such as Ms. Knight, are routine and limited in comparison to those of a deputy sheriff, who may be fired for his political affiliation."); id. ("A jailer is not the sheriff's 'second self' in the sense that a deputy is.").

The broader reading of Jenkins is also in line with a statement from another of our opinions, which was issued after Knight. In Pike v. Osborne, 301 F.3d 182 (4th Cir. 2002), we held that, on a claim that a sheriff terminated a dispatcher for political affiliation reasons, the sheriff was entitled to qualified immunity because in December 1999 it was not clearly established that a sheriff in Virginia could not lawfully terminate, for political affiliation reasons, a dispatcher who was privy to confidential information. See Pike, 301 F.3d at 186 (Hamilton, J., concurring in the judgment); id. (Broadwater,

56

J., concurring in the judgment) (adopting Judge Hamilton's reasoning). Judge Hamilton began his analysis in that case with the statement, "The law of this circuit is clear that sheriffs in Virginia have the right to lawfully terminate their deputies for political affiliation reasons." Id. (citing Jenkins). He then proceeded to explain why the law was nevertheless not clear regarding whether a dispatcher with access to confidential information, who was not a deputy, could be terminated for political affiliation reasons. See id.[19]

For the reasons we explained in reviewing the merits of the Elrod-Branti issue, we believe that this language, while consistent with the Jenkins dissent's characterization of Jenkins's reasoning, is an overstatement in light of the Jenkins majority's specific rejection of the dissent's characterization of its analysis. Nevertheless, considering the conflicting signals that Jenkins and Pike sent, we conclude that a reasonable sheriff in December 2009 could have believed that he

---

[19] Other courts have, at times, also described Jenkins's holding broadly. See, e.g., Hall v. Tollett, 128 F.3d 418, 428 (6th Cir. 1997) (stating that Jenkins "held that political affiliation is an appropriate requirement for deputy sheriffs"); Fields v. County of Beaufort, 699 F. Supp. 2d 756, 764 (D.S.C. 2010) ("The Fourth Circuit determined that the office of deputy is that of a policymaker, and therefore, the deputies were lawfully terminated for political reasons.").

was authorized to terminate any of his deputies for political reasons.[20]

If we were deciding what the law was in December 2009 regarding the legality of a sheriff firing a deputy for political reasons, we would agree with our colleague in dissent that the law was that a sheriff could not fire for political reasons a deputy sheriff with the limited duties of a jailer. Where we believe we differ in our assessment of this case is in whether that law was clearly established and would have been so recognized not by a judge trained in the law, but by a reasonable sheriff.

For the reasons stated previously, we believe we have sent mixed signals as to when a sheriff could fire a deputy for political reasons and we have been unclear as to when he could and when he could not. Some parts of our en banc decision in Jenkins indicate he could do so and other parts would prohibit it. The dissent in Jenkins expressed its own confusion as to what the holding of Jenkins was and language in our cases since, as well as those from other courts, have interpreted the holding

---

[20] We emphasize that even a sheriff who read the specific holding of Jenkins as limited to North Carolina deputies involved in law enforcement could still have reasonably concluded that, if we were squarely presented with the issue, we would hold that a sheriff could terminate any of his deputies for political reasons regardless of their particular duties.

in <u>Jenkins</u> broadly and consistent with the Sheriff's. In short, we understand why a sheriff would not find the law in this situation clear, particularly given that he is a lay person.

We do not expect sheriffs to be judges and to have the training to sort through every intricacy of case law that is hardly a model of clarity. See <u>Lawyer v. City of Council Bluffs</u>, 361 F.3d 1099, 1108 (8th Cir. 2004) (holding that defendants were entitled to qualified immunity because "[p]olice officers are not expected to parse code language as though they were participating in a law school seminar"); <u>Lassiter v. Alabama A&M Univ. Bd. of Trustees</u>, 28 F.3d 1146, 1152 n.8 (11th Cir. 1994) ("Even if some legal expert would have then concluded that a hearing was required, defendants would still be due qualified immunity if reasonable university officials would not have known about it."), <u>overruled on other grounds by</u> <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002). Rather, in considering whether constitutional rights were clearly established for qualified-immunity purposes, we view the issue from "the layman's perspective," <u>Ross v. Reed</u>, 719 F.2d 689, 696 n.8 (4th Cir. 1983), recognizing that "[p]articularly with regard to legal conclusions, lay officers obviously cannot be expected to perform at the level achievable by those trained in the law," <u>Kroll v. United States Capitol Police</u>, 847 F.2d 899, 906 (D.C.

Cir. 1988) (Robinson, J., concurring in the judgment) (footnote omitted).

We note that in cases in which the Elrod-Branti exception applies, and an employer therefore does not violate his employee's association rights by terminating him for political disloyalty, the employer also does not violate his employee's free speech rights by terminating him for speech displaying that political disloyalty.[21]  See Jenkins, 119 F.3d at 1164  (holding that because pleadings established that Elrod-Branti exception applied, deputies failed to state a First Amendment speech retaliation claim that deputies were dismissed for campaigning against the sheriff).  Thus, a reasonable sheriff in December 2009 who believed that the Elrod-Branti exception applied to his deputies could have also reasonably believed that he could choose not to reappoint them for their speech indicating their political disloyalty to him.  And Carter's and McCoy's Facebook activity and Dixon's bumper sticker and polling-place comment certainly fall into that category.  For this reason, we conclude

---

[21]  "[O]nly infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a particularized balancing that is subtle, difficult to apply, and not yet well-defined."  DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir. 1995) (internal quotation marks omitted); see also McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998).

60

that the Sheriff was entitled to qualified immunity concerning the claims of Carter, McCoy, and Dixon.[22]

E.    Conclusion

In sum, as to the claims of Sandhofer, Woodward, and Bland, we conclude the district court properly analyzed the merits of the claims, and we therefore affirm the grant of summary judgment in favor of the Sheriff. As to the claims of Carter, McCoy, and Dixon, the district court erred by concluding that the Plaintiffs failed to create a genuine dispute of material fact regarding whether the Sheriff violated their First Amendment rights. Nevertheless, the district court properly ruled that the Sheriff was entitled to qualified immunity on Carter's, McCoy's, and Dixon's claims seeking money damages against the Sheriff in his individual capacity, and that the Sheriff was entitled to Eleventh Amendment immunity against those claims to the extent they seek monetary relief against him in his official capacity. The Sheriff is not entitled to Eleventh Amendment immunity, however, on Carter's, McCoy's, and Dixon's claims to the extent the remedy sought is reinstatement.

---

[22] Plaintiffs maintain that the Sheriff is not entitled to qualified immunity because the Sheriff's testimony demonstrated that he actually realizes that he cannot fire his employees on the basis of their political opposition to him. However, qualified immunity depends not on what the actual sheriff knew at the time of his deposition but on what a hypothetical, objectively reasonable sheriff would have known in December 2009.

III.

Accordingly, for the foregoing reasons, we reverse the grant of summary judgment to the Sheriff regarding Carter's, McCoy's, and Dixon's reinstatement claims, and we remand these claims to the district court for further proceedings. We otherwise affirm the grant of summary judgment to the Sheriff.

AFFIRMED IN PART,
REVERSED IN PART,
AND REMANDED

ELLEN LIPTON HOLLANDER, District Judge, concurring in part and dissenting in part:

I concur in Chief Judge Traxler's excellent opinion, with one exception. The majority concludes that, at the relevant time, "a reasonable sheriff could have believed he had the right to choose not to reappoint his sworn deputies for political reasons," Maj. Op. at 53, and, on this basis, it determines that Sheriff Roberts is protected by qualified immunity with respect to his discharge of Carter, Dixon, and McCoy. In my view, when these deputies were discharged in December 2009, the law was clearly established that a sheriff's deputy with the job duties of a jailer could not be fired on the basis of political affiliation. Therefore, I respectfully disagree with the majority's ruling as to qualified immunity.

In general, "the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments." Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality); see Branti v. Finkel, 445 U.S. 507, 516-17 (1980) (recognizing, generally, that "the First Amendment prohibits the dismissal of a public employee solely because of his private political beliefs"). Based on what is known as the Elrod-Branti doctrine, "public employees who allege that they were discharged . . . solely because of their partisan political affiliation or nonaffiliation state a claim for deprivation of constitutional

63

rights secured by the First and Fourteenth Amendments." Elrod, 427 U.S. at 349. This case concerns the scope of "a narrow exception" to that baseline rule, Maj. Op. at 10, which frames the qualified immunity analysis.

Pursuant to the exception to the Elrod-Branti doctrine, dismissal based on political affiliation is lawful if "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti, 445 U.S. at 518. The Supreme Court's formulation of the doctrine clearly puts the onus on the employer to establish that a particular employee comes within the exception to the rule barring discharge of a public employee based on political affiliation. The majority correctly concludes that, in the light most favorable to plaintiffs, they were dismissed in violation of their rights under the First Amendment.[1] This, in turn, requires consideration of Sheriff Roberts' defense of qualified immunity.

---

[1] As the majority observes, both the free expression and political affiliation claims of Carter, McCoy, and Dixon stand or fall on the question of whether those plaintiffs come within the exception to the Elrod-Branti rule because, "in cases in which the Elrod-Branti exception applies, and an employer thus can terminate his employees for political disloyalty, he may also terminate them for speech that constitutes such disloyalty." Maj. Op. at 12 n.5. Accordingly, the qualified immunity analysis applies equally to the free expression and political affiliation claims of these three deputies.

"Qualified immunity balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The qualified immunity analysis involves two inquiries: first, whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional [or statutory] right," Saucier v. Katz, 533 U.S. 194, 201 (2001); and second, whether the right at issue "'was clearly established in the specific context of the case -- that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" Merchant v. Bauer, 677 F.3d 656, 662 (4th Cir.) (citation omitted), cert. denied, ___ U.S. ___, 133 S. Ct. 789 (2012). The "two inquiries . . . may be assessed in either sequence." Id. at 661-62.

"To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.' In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, ___ U.S. ___, 132 S. Ct. 2088, 2093 (2012) (quoting Ashcroft v.

65

al-Kidd, 563 U.S. ___, 131 S. Ct. 2074, 2078, 2083 (2011)) (some internal quotation marks and citations omitted).  The issue is "assessed in light of the legal rules that were 'clearly established' at the time" of the disputed conduct. Messerschmidt v. Millender, ___ U.S. ___, 132 S. Ct. 1235, 1245 (2012) (citation and some internal quotation marks omitted). Accordingly, we must consider the state of the law in December 2009, when Sheriff Roberts discharged Carter, Dixon, and McCoy.

As to the first prong of the inquiry, which evaluates the merits of the claim of constitutional violation, the majority determines that, in the light most favorable to plaintiffs, Sheriff Roberts improperly dismissed them. In reaching that conclusion, the majority engages in a careful analysis of Jenkins v. Medford, 119 F.3d 1156 (4th Cir. 1997) (en banc), cert. denied, 522 U.S. 1090 (1998), and Knight v. Vernon, 214 F.3d 544 (4th Cir. 2000).  In my view, these same cases are dispositive as to the second prong of the qualified immunity inquiry.  Jenkins and Knight clearly established that the Elrod-Branti doctrine requires consideration of a deputy's actual job responsibilities, rather than the title of the position.

The Supreme Court's formulation of the doctrine, of course, is paramount.  In Elrod, a newly elected Democratic sheriff discharged several Republican employees of the Sheriff's Office "solely because they did not support and were not members of the

66

Democratic Party . . . ." 427 U.S. at 350-51. One of the discharged employees was "Chief Deputy of the Process Division and supervised all departments of the Sheriff's Office" at a certain location; another employee was a courthouse "bailiff and security guard"; a third employee was a process server in the office. Id. On First Amendment grounds, the employees sued in federal court to enjoin their termination. Three justices of the Supreme Court, joined by two concurring justices, held that the district court should have granted the injunction. See id. at 373. The three-justice plurality opined that "the practice of patronage dismissals is unconstitutional" because "any contribution of patronage dismissals to the democratic process does not suffice to override their severe encroachment on First Amendment freedoms." Id. at 373.

The two concurring justices articulated an exception to that general principle, viewing the case as presenting only a "single substantive question": "whether a nonpolicymaking, nonconfidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." Id. at 375 (Stewart, J., concurring) (emphasis added).[2] The

---

[2] Because the concurring justices' votes were necessary to the judgment, their more narrow view stated the holding of the (Continued)

concurring justices "agree[d] with the plurality" that such an employee could not be dismissed on the basis of political affiliation.  Id.

Four years later, in Branti, supra, 445 U.S. 507, a majority of the Court reaffirmed Elrod's holding, in the context of the imminent firing of two Republican assistant public defenders by a Democratic public defender.  See id. at 508-09. In so doing, the Branti Court reformulated the Elrod concurrence's exception to the prohibition of dismissals on the basis of political affiliation for "policymaking" or "confidential" employees.  The Branti Court said: "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."  Id. at 518.  It concluded that the assistant public defenders did not fall into the exception to the general rule barring termination on the basis of political affiliation, even though, in some respects,

Court under the "narrowest grounds" doctrine of Marks v. United States, 430 U.S. 188 (1977).

68

they were involved in policymaking or privy to confidential information. Id. at 519-20.[3]

Consistent with Elrod and Branti, this circuit's case law has long required courts to "'examine the particular responsibilities of the position'" to determine whether a given public employee comes within the exception to the rule against patronage dismissals. Maj. Op. at 11 (quoting Stott v. Haworth, 916 F.2d 134, 142 (4th Cir. 1990)). In Stott, the court articulated a two-part test to guide the analysis. The first part requires examination of "'whether the position at issue, no matter how policy-influencing or confidential it may be, relates to partisan political interests . . . [or] concerns.'" Stott, 916 F.2d at 141 (citations and some internal quotation marks omitted). If the position does "'involve government decision-making on issues where there is room for political disagreement on goals or their implementation,'" the second "'step is to examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to

---

[3] In two subsequent cases, the Supreme Court extended the Elrod-Branti doctrine in ways that are not germane to this case. See Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990) (holding that Elrod-Branti doctrine also applies to "promotion, transfer, recall, and hiring decisions"); O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712 (1996) (holding that Elrod-Branti doctrine applies "where government retaliates against a[n] [independent] contractor, or a regular provider of services, for the exercise of rights of political association or the expression of political allegiance").

confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement.'" Id. at 141-42 (citation omitted). The court recognized political affiliation as an appropriate job requirement "'when there is a rational connection between shared ideology and job performance.'" Id. at 142 (citation omitted).

This circuit's Elrod-Branti case law has continued to adhere to Stott's focus on the job responsibilities of a given position. See, e.g., Fields v. Prater, 566 F.3d 381, 386-87 (4th Cir. 2009) (applying Stott analysis); Nader v. Blair, 549 F.3d 953, 959-62 (4th Cir. 2008) (same). Commenting on the test endorsed by Stott, the court said in Jenkins, 119 F.3d at 1162: "Our cases have moved . . . to position-specific analyses."

The majority's conclusion that, at the relevant time, the law as to deputy sheriffs was not clearly established is based largely on its belief that Jenkins sent "very mixed signals" as to the status of a sheriff's deputy under the Elrod-Branti doctrine. Maj. Op. at 53. Jenkins, which involved the termination of ten North Carolina sheriff's deputies, contains instances in which the court used broad language that, according to the majority here, arguably suggested that a Sheriff could terminate a deputy for political reasons, without regard to actual duties. Id. But, the Jenkins majority took pains to

70

define the scope of its holding and to resolve any "tension" created by its language.  Id. at 54.

The Jenkins majority stated that, "in North Carolina, the office of deputy sheriff is that of a policymaker, and . . . deputy sheriffs are the alter ego of the sheriff generally, for whose conduct he is liable," and concluded from this "that such North Carolina deputy sheriffs may be lawfully terminated for political reasons under the Elrod-Branti exception to prohibited political terminations."  Jenkins, 119 F.3d at 1164.  The Jenkins majority also said: "We hold that newly elected or reelected sheriffs may dismiss deputies either because of party affiliation or campaign activity."  Id.

These statements cannot be read in isolation, however. The Jenkins majority was engaged in overruling the court's earlier decision in Jones v. Dodson, 727 F.2d 1329 (4th Cir. 1984), which had held that deputy sheriffs could not be fired on the basis of political affiliation, "no matter what the size of the office, or the specific position of power involved, or the customary intimacy of the associations within the office, or the undoubted need for mutual trust and confidence within any law enforcement agency." Id. at 1338. The Jenkins Court announced, 119 F.3d at 1164: "We disagree with Dodson to the extent it suggests that no deputy sheriff can ever be a policymaker."

71

The dissent in <u>Jenkins</u> maintained that the majority "refus[ed] to engage in the proper <u>Elrod</u>-<u>Branti</u> analysis . . . ." <u>Id.</u> at 1171 (Motz, J., dissenting). Pointing to the broad, categorical language employed by the <u>Jenkins</u> majority, the dissent reasoned that the majority had found that "<u>all</u> (more than 4,600 in 1988) North Carolina deputy sheriffs are policymakers," thereby "call[ing] into question whether the numerous North Carolina state troopers (more than 1,100 in 1988) and police officers (more than 7,900 in 1988) are also 'policymakers' who can be dismissed at will by each new political regime." <u>Id.</u> (emphasis in original).

In response, the <u>Jenkins</u> majority expressly rejected the dissent's construction of its holding, explaining that its holding was "limit[ed]" to "<u>those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff</u>." <u>Id.</u> at 1165 (emphasis added). Further, the <u>Jenkins</u> majority insisted that its holding "applies only to those who meet the requirements of the rule as we state it," <u>id.</u> at 1165 n.66, and did "not extend to all 13,600 officers in North Carolina, as the dissent suggests." <u>Id.</u> It reasoned that the "deputies in the instant case" fell within the <u>Elrod</u>-<u>Branti</u> exception "[b]ecause" they were "<u>law enforcement officers</u>." <u>Id.</u> at 1165 (emphasis added).

72

Of import here, the Jenkins majority directed that "the district courts are to engage in a Stott-type analysis, examining the specific position at issue . . . ." Id. at 1164 (emphasis added). Moreover, the Jenkins majority directly admonished sheriffs within the Fourth Circuit, stating: "We issue this limitation to caution sheriffs that courts examine the job duties of the position, and not merely the title, of those dismissed." Id. at 1165 (emphasis added). This directive is particularly salient, given that qualified immunity is predicated on the notion that "a reasonably competent public official should know the law governing his conduct." Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982); accord Trulock v. Freeh, 275 F.3d 391, 400 (4th Cir. 2001), cert. denied, 537 U.S. 1045 (2002).

Notably, the majority here acknowledges "the Jenkins majority's specific rejection of the dissent's characterization of its analysis." Maj. Op. at 57. But, even assuming that Jenkins left the state of circuit precedent unclear as to the application of the Elrod-Branti doctrine to deputy sheriffs, the court's subsequent decision in Knight v. Vernon, supra, 214 F.3d 544, laid to rest any ambiguity with respect to sheriff's deputies serving as jailers.

In Knight, the district court had relied on Jenkins in granting summary judgment to a sheriff who fired a jailer, based

73

on the district court's conclusion that the role of a jailer is similar to the role of a deputy. See Knight v. Vernon, 23 F. Supp. 2d 634, 646 (M.D.N.C. 1998), rev'd in part, aff'd in part on other grounds, 214 F.3d 544 (4th Cir. 2000). This court disagreed, thereby clarifying any possible confusion as to the proper construction of Jenkins.

The court expressly held that "a sheriff cannot insist on political loyalty as a job requirement for a county jailer . . . ." 214 F.3d at 548. It reasoned that "political allegiance to [the sheriff] was not an appropriate requirement for the performance of [the] job [of] jailer," id. at 550, and this would be so even if the jailer had taken the oath of a deputy sheriff. Id. at 551.[4] In its analysis, the majority reiterated that the "central message of Jenkins is that the specific duties of the public employee's position govern whether political allegiance to her employer is an appropriate job requirement." Id. at 549 (emphasis added).

Focusing on the particular job duties of a jailer, the Knight majority emphasized the "circumscribed," "routine," and

---

[4] According to the Knight majority, the record was clear that Knight never took a law enforcement officer's oath. Knight, 214 F.3d at 546. The dissent disagreed. See id. at 555 (Widener, J., dissenting). But, of significance here, the majority determined, in the alternative, that "even if Ms. Knight did take such an oath, it would not change our decision." Id. at 551 (majority).

"limited" responsibilities of the position, in contrast to those of a sheriff's deputy with "the general power of arrest." Id. at 550. It noted that "exercising the power of arrest is not one of the job duties of a jailer. Her duties are simply to supervise and care for inmates in the county jail." Id. The Knight majority also observed: "Ms. Knight was not out in the county engaging in law enforcement activities on behalf of the sheriff. She was not a confidant of the sheriff, and she did not advise him on policy matters. Nor was she involved in communicating the sheriff's policies or positions to the public." Id.

In its analysis of the merits, the majority here acknowledges that the job duties of Carter, McCoy, and Dixon were "essentially identical to those of the plaintiff in Knight v. Vernon." Maj. Op. at 18. It goes on to say, in the context of their termination, that "the near identity between the duties of the deputy plaintiffs in this case and Knight's duties warrants the same result here." Id. at 21. I readily agree with the majority that there is no cognizable distinction for purposes of the Elrod-Branti doctrine between the jailer in Knight and the jailers in this case. As I see it, that should end the qualified immunity inquiry.

To be sure, the jailers here were sworn deputy sheriffs. But, they did not exercise law enforcement responsibilities (or,

75

at least, have raised a genuine factual dispute as to whether they did). The district court asserted that, because the "officers in this case were sworn, uniformed deputies," they had "the power of arrest." Bland v. Roberts, 857 F. Supp. 2d 599, 609 (E.D. Va. 2012). But, as the majority observes, see Maj. Op. at 22-23, the deputies here could not lawfully exercise the arrest power, except in extraordinary circumstances, because they had been trained as jailers rather than as law enforcement officers, and the arrest power was not an appreciable aspect of their duties. Indeed, the undisputed record evidence is that no deputy in the Sheriff's Department had made an arrest in the preceding sixteen years.

Moreover, as the majority points out, the record is clear that, although the jailers in this case took an oath, they did not take a law enforcement officer's oath. See Maj. Op. at 21. This renders the finding of qualified immunity weaker still, because the Knight Court concluded that even a jailer who does take a law enforcement officer's oath cannot be discharged on the basis of political affiliation. See Knight, 214 F.3d at 551.

In contrasting the role of a "jailer" with that of a "deputy sheriff, who may be fired for his political affiliation," id. at 550, the Knight Court was referring to the type of deputy discussed "in Jenkins": a deputy who "is a sworn

law enforcement officer" and who "has the general power of arrest, a power that may be exercised in North Carolina [and Virginia] only by an officer who receives extensive training in the enforcement of criminal law." Id. A reasonable sheriff reading Knight would realize that such a description of a "deputy" did not encompass Carter, McCoy, and Dixon, who served as jailers, and would have heeded the court's warning in both Knight and Jenkins that "'courts examine the job duties of the position, and not merely the title, of those dismissed.'" Knight, 214 F.3d at 549 (quoting Jenkins, 119 F.3d at 1165) (emphasis in Knight).

In support of its view that the pertinent law was not clearly established when plaintiffs were discharged in December 2009, the majority places unwarranted emphasis on Pike v. Osborne, 301 F.3d 182 (4th Cir. 2002). In that case, the court held that a sheriff was entitled to qualified immunity in connection with the termination in 1999 (i.e., before Knight was decided) of two dispatchers, based on their political affiliation. In a concurrence, one member of the panel concluded that the law was not clearly established "on the point of whether sheriffs in Virginia can lawfully terminate for political affiliation reasons dispatchers with privity to confidential information." Pike, 301 F.3d at 186 (Hamilton, J.,

77

concurring) (emphasis added).[5] The concurrence prefaced its discussion of the sheriff's entitlement to qualified immunity with a statement upon which the majority here relies: the "law in this circuit is clear that sheriffs in Virginia have the right to lawfully terminate their deputies for political affiliation reasons." Id. at 186 (citing Jenkins).

But, this assertion was clearly dicta, because Pike did not involve sheriff's deputies.[6] And, privity to confidential information, upon which Pike's holding turned, is not at issue here. The majority acknowledges that the Pike concurrence overstated the holding of Jenkins. Maj. Op. at 57. As of December 2009, Jenkins, as well as Stott and Knight, were part of the clearly established law of this circuit. In my view, it sets a troubling precedent if this circuit's clearly established law can be undone by dicta.

Stott emphasized the importance of analyzing job duties in cases such as this one. Speaking en banc, the Jenkins Court expressly admonished sheriffs that "courts examine the job

---

[5] The opinion, although labeled a concurrence, was joined by one of the other two judges on the panel.

[6] "Dictum is 'statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding -- that, being peripheral, may not have received the full and careful consideration of the court that uttered it.'" Pittston Co. v. United States, 199 F.3d 694, 703 (4th Cir. 1999) (citation omitted); accord New Cingular Wireless PCS, LLC v. Finley, 674 F.3d 176, 241 (4th Cir. 2012).

duties of the position, and not merely the title, of those dismissed." Jenkins, 119 F.3d at 1165 (emphasis added). And, Knight reinforced that point, characterizing it as the "central message of Jenkins." Knight, 214 F.3d at 549. Knight also made clear that a sheriff may not terminate a jailer for political reasons, even if the jailer took an oath as a law enforcement officer. See Knight, 214 F.3d at 551. Pike did not alter any of this.

The salient facts of this case are so close to the facts in Knight that any reasonable sheriff would have predicted that both cases would yield the same result. To the extent that there is any distinction between Knight and this case, it concerns only the title of the positions held by the employees. Yet, it was clearly established that the title itself is of no legal significance. Therefore, Sheriff Roberts should have known that he could not discharge his jailers on the basis of their political affiliation.

The majority is correct in stating that, in considering whether the law was clearly established for purposes of qualified immunity, we look to the perspective of a layperson, not a lawyer. See Maj. Op. at 58-60. And, as the Supreme Court recognized in Hope v. Pelzer, 536 U.S. 730, 739 (2002), the "contours" of the constitutional right "'must be sufficiently clear [so] that a reasonable official would understand that what

79

he is doing violates that right.'" (Citation omitted). Yet, the Supreme Court also underscored that the "very action in question" need not have "'previously been held unlawful'" if, "in the light of pre-existing law the unlawfulness [is] apparent." Id. (citations omitted). See also Wilson v. Kittoe, 337 F.3d 392, 403 (4th Cir. 2003) (qualified immunity may be denied even in the absence of "'a case holding the defendant's identical conduct to be unlawful . . . .'") (citation omitted).

"Qualified immunity extends to protect officials 'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" Williams v. Ozmint, 716 F.3d 801, 805 (4th Cir. 2013) (quoting Henry v. Purnell, 652 F.3d 524, 531 (4th Cir.) (en banc), cert. denied, ___ U.S. ___, 132 S. Ct. 781 (2011)); accord Durham v. Horner, 690 F.3d 183, 188 (4th Cir. 2012). It is intended to "protect[ ] public officials from 'bad guesses in gray areas.'" Durham, 690 F.3d at 190 (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992), cert. denied, 506 U.S. 1080 (1993)). There were no gray areas here.

In 1997, this court delivered an unequivocally clear message to lay sheriffs. Directly addressing sheriffs, the Jenkins Court announced: "We . . . caution sheriffs that courts examine the job duties of the position, and not merely the title, of those dismissed." Jenkins, 119 F.3d at 1165. Any

80

person capable of serving as a sheriff surely would have understood that directive, which was subsequently reiterated in Knight, and would have grasped what all the members of this panel agree was "the law . . . in December 2009 regarding the legality of a sheriff firing a deputy for political reasons." Maj. Op. at 58.[7]

In sum, Sheriff Roberts' dismissal of Carter, McCoy, and Dixon on the basis of their political allegiance, if ultimately proven, cannot be excused on the basis of qualified immunity. Therefore, I respectfully dissent from the portion of the majority opinion that upholds the finding of qualified immunity for Sheriff Roberts with respect to the First Amendment claims lodged by Carter, McCoy, and Dixon.

---

[7] The majority has correctly disregarded Sheriff Roberts' subjective understanding of the law in applying the objective analysis called for by the qualified immunity doctrine. See Maj. Op. at 61 n.22. It is worth noting, however, that there is no indication that Sheriff Roberts was laboring under a misapprehension of the law. At his deposition, Roberts stated that he did not believe he was entitled to fire the plaintiffs "for political reasons." JA 96. Instead, Roberts disputed plaintiffs' claim that he fired them for political reasons. As the court unanimously concludes, see Maj. Op. at 25-31, there are genuine disputes of material fact as to the basis for Roberts' termination of Carter, McCoy, and Dixon.

81